IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

                                  CIVIL ACTION FILE

v.                       NO. 1:10-CR-00160-ODE-GGB

MARK JOSHUA RUARK,

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

Defendant Mark Joshua Ruark is charged with bank robbery, Hobbs Act robbery, two counts of carrying a firearm during a crime of violence, and possession of a firearm by a convicted felon.  Ruark suffers from schizophrenia and has been declared incompetent to stand trial.  He has refused to take antipsychotic medication, so the government has moved for a court order directing that he be involuntarily medicated (Doc. 102).

I held a hearing on the government's motion pursuant to <u>Sell v. United States</u>, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).  After thoroughly considering the evidence presented during the hearing and the parties' arguments, I conclude that the government has met its burden of showing, by clear and convincing evidence, that Ruark should be involuntarily medicated.  Therefore, I **RECOMMEND** that the government's motion (Doc. 102) be **GRANTED**.

I.      **Background**

A.      **The charges against Ruark**

On April 13, 2010, a federal grand jury returned a five-count indictment against Ruark.  (Doc. 1).  Count One alleges that Ruark carried out an armed robbery of a bank in Kennesaw, Georgia, in violation of 18 U.S.C. § 2113(a) and (d).  (Id. at 1).  Count Two charges Ruark with carrying and brandishing a firearm during and in relation to the bank robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  (Id. at 1-2).  Count Three states that Ruark robbed the Cost Plus World Market in Kennesaw, a business engaged in interstate commerce, in violation of 18 U.S.C. § 1951.  (Id. at 2).  Count Four alleges that Ruark brandished and carried a firearm during the Cost Plus robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  (Id. at 3).  Finally, Count Five of the indictment charges Ruark with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  (Id. at 3-4).

B.      **Initial proceedings and competency determination**

Immediately following his indictment, Ruark was brought into federal custody on a writ, and I ordered that he be detained.  (See Docs. 4, 7, 8).  Ruark has remained in custody since that time.  The trial in this case originally was set for January of 2011

2

but later was continued.  (Docs. 36, 37, 38).  In February 2011, Ruark filed notice of his intent to raise an insanity defense.  (Doc. 43).

In May 2011, the defense moved for an order declaring Ruark incompetent to stand trial.  (Doc. 67).  This motion was based on the evaluation of a psychiatrist, Dr. Bhushan S. Agharkar, who concluded that Ruark was suffering from schizophrenia. (Doc. 101-3, Agharkar Report).  Following a competency hearing, both sides agreed that Ruark was not fit to stand trial, and I entered an order so finding.  (Doc. 91).  I directed that Ruark be remanded to the custody of the Attorney General for medical treatment.  (Id.).  Ruark was transferred to the Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield").  Because Ruark has refused to take his prescribed antipsychotic medications, the government has now moved for an order directing that Ruark be involuntarily medicated.  (Doc. 102).

## II.    The Sell Hearing

The Sell hearing in this case was held in two stages.  During the first part of the hearing, which took place on May 20, 2013, the government presented testimony from Dr. Lea Ann Preston-Baecht, a staff psychologist at Springfield, and Dr. Robert Sarrazin, the chief of psychiatry at Springfield.  This testimony was taken via video conference.

AO 72A
(Rev.8/82)

During the second part of the hearing, on November 5 and 6, 2013, defense counsel was given the opportunity to cross-examine both Dr. Preston-Baecht and Dr. Sarrazin in person.  Defense counsel also presented testimony from Dr. Gabriella Ramirez-Laon, a clinical psychologist at the United States Penitentiary in Atlanta ("USP Atlanta").  The evidence from both parts of the hearing is summarized below.

### A.    Dr. Preston-Baecht

Dr. Preston-Baecht has worked as a staff psychologist at Springfield since 2000. (Doc. 115 at 4-5).  She has evaluated over 500 inmates and has testified as an expert in forensic psychology in numerous federal court proceedings, including 30 to 40 hearings regarding the involuntary medication of a defendant.  (Id. at 6-7, 10).  A review of her 2007 cases revealed that 80 percent of defendants who were involuntarily medicated were successfully treated.  (Id. at 12).  The success rate since that time has been relatively similar, with 75 to 80 percent of involuntarily medicated defendants being restored to competency.  (Id.).

Dr. Preston-Baecht conducted an evaluation of Ruark when he first arrived at Springfield.  (Id. at 13-14).  Ruark appeared to be "rather agitated" during the initial interview.  (Id. at 15).  He told Dr. Preston-Baecht that someone was entering his room at night and trying to touch him sexually.  Ruark was reluctant to answer questions

4

about his personal history and insisted that he was not mentally ill.  His overall presentation "was consistent with someone who was paranoid of others."  (Id.).

Dr. Preston-Baecht reviewed Ruark's mental health records from the Bureau of Prisons ("BOP").  (Id. at 13-14).  These records showed that Ruark had been taking Geodon, an antipsychotic medication, while housed at USP Atlanta.  (Id. at 16).  Later, he was given another anti-psychotic medication, Zyprexa.  (Id.). Although these medications were prescribed, it was unclear from the records if Ruark was always compliant with them.  (Id. at 17).  Based on Ruark's medical records and his presentation during the interview, Dr. Preston-Baecht diagnosed paranoid schizophrenia.  (Id. at 14, 23-24).

Dr. Preston-Baecht saw Ruark on a regular basis during his time at Springfield. (Id. at 17-18).  Although Ruark continued to insist that he was not mentally ill, Dr. Preston-Baecht was able to convince him to resume taking Geodon for a period of time.  (Id. at 18).  The medication appeared to calm him somewhat, but his paranoia was not completely alleviated.  (Id.).  Ruark abruptly stopped taking the Geodon after two months because he believed that it had weakened his immune system, causing him to catch a cold.  (Id. at 18, 21).

Dr. Preston-Baecht did not believe that Ruark had been on the Geodon for long enough or in a high enough dose for it to be fully effective. (Id. at 18). Over the next several months, she continued to encourage Ruark to restart the medication. (Id. at 24). Ruark briefly resumed the Geodon in August of 2012, but stopped again after a short time and refused to take it for the remainder of his stay at Springfield. (Id.).

In light of Ruark's intransigence, Dr. Preston-Baecht requested an administrative hearing on whether Ruark could be involuntarily medicated on grounds of disability or dangerousness. (Id. at 24-25). BOP regulations allow for an administrative order of involuntary medication in cases where the inmate's condition poses a danger to himself or to others.[1] (Id. at 25-26). The hearing officer concluded that Ruark did suffer from a psychotic disorder but did not pose a danger to others while he remained in a correctional environment. Therefore, the request for involuntary medication was denied. (Id.).

Dr. Preston-Baecht testified that alternative forms of treatment such as counseling likely would not be successful in reducing Ruark's paranoia. (Id. at 22). The Springfield facility has a competency restoration group that prisoners are encouraged to attend on a weekly basis. (Id. at 21). The purpose of the group is to explain to

---

[1]Involuntary medication in these situations is constitutionally permissible under Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

6

prisoners how the criminal justice system works.  (<u>Id.</u> at 21-22).  After attending two sessions of the group, Ruark announced that he was going to stop attending because it was too upsetting for him.  (<u>Id.</u> at 22).  Dr. Preston-Baecht believed that Ruark was "a bright young man who understands how the court system works," but his "level of paranoia interferes with his ability to rationally apply that information to his own case." (<u>Id.</u> at 22-23).

Dr. Preston-Baecht believed that Ruark's paranoid thinking would make any attempt at psychotherapy ineffective.  (<u>Id.</u> at 23).  Her own attempts to challenge Ruark's beliefs always were met with "great resistance."  Dr. Preston-Baecht noted that paranoid schizophrenia has a strong biological basis and that the standard treatment for alleviating that condition is antipsychotic medication.  (<u>Id.</u>).

Dr. Preston-Baecht opined that Ruark was unlikely to regain competency in the absence of medication.  (<u>Id.</u> at 27).  In his conversations with the medical staff, he did not show a rational appreciation of the charges against him and "expressed great distress towards a number of individuals in the courtroom," including defense counsel.  (<u>Id.</u>). Without further treatment, Dr. Preston-Baecht did not believe that Ruark would be able to testify relevantly, communicate with his counsel, or make well-reasoned decisions regarding his case.  (<u>Id.</u>; <u>see also</u> Doc. 101-2 at 8, Report of Dr. Preston-Baecht).

Dr. Preston-Baecht testified that patients with schizophrenia generally must take medication for four to eight months before successfully regaining competency.  (Id. at 29).  She reiterated that antipsychotic medication would be medically appropriate in Ruark's case and that there are no less intrusive methods available.  (Id. at 31-32).  Administration of antipsychotic medication is in accordance with the generally-accepted standard for treating schizophrenia.  (Id. at 32).

On cross-examination, Dr. Preston-Baecht akcnowledged that the government sometimes moves for civil commitment of a defendant rather than for involuntary medication.  (Id. at 66).  She also recognized that treatment notes from USP Atlanta showed that Ruark had been doing "fairly well" since his return from Springfield and did not appear to be showing any signs of a psychotic disorder.  (Doc. 126 at 83).  However, she believed that Ruark simply was being guarded because he did not want to be labeled as mentally ill and did not want to be involuntarily medicated.  In her experience, such behavior is common for a person with a mental illness.  (Id.).  Individuals with paranoid schizophrenia are capable of higher functioning and can appear normal in situations where their delusions are not implicated.  (Id. at 87-88).

## B.    Dr. Sarrazin

Dr. Robert Sarrazin testified that he has served as chief of psychiatry at Springfield since 2004. (Doc. 115 at 33). Dr. Sarrazin is a medical doctor by training and has extensive experience in both general and forensic psychology. (Id. at 34-35). He has performed psychiatric evaluations in hundreds of cases and has frequently testified in cases where involuntary medication is sought by the government. (Id. at 35-36). In cases where involuntary medication was ordered, between 75 and 80 percent of Dr. Sarrazin's clients were restored to competency. (Id. at 36-37).

In his written report, Dr. Sarrazin discusses multiple studies regarding the effectiveness of involuntary medication in treating schizophrenic prisoners. (Doc. 101-1, Sarrazin Report at 5-7). The results of these studies are summarized in United States v. Diaz, 630 F.3d 1314 (11th Cir. 2011), another involuntary medication case where Dr. Sarrazin testified as an expert witness:

> Dr. Sarrazin reviewed several studies addressing the use of medication to restore psychotic patients to competency. He summarized the results of these studies as follows: (1) a general 1992 study of 150 incompetent defendants in a state forensic hospital found that only 8 of these patients could not be restored to competency, yielding an approximate 95% success rate; (2) a 1993 study of 45 incompetent pre-trial defendants, suffering from psychotic disorders, found that 87% of these patients were restored to competency with involuntary psychotropic medication; (3) a 2007 study reviewing Ohio state psychiatric hospitalizations from 1995 to 1999 found that 75% of patients were restored to competency with involuntary medication; and (4) another 2007 study of 22 individuals diagnosed with delusional disorder (a psychotic disorder different from schizophrenia)

found that 77% of the patients were restored to competency by the use of involuntary anti-psychotic medication. Based on this data, as well as his own experience with involuntary medication of patients, Dr. Sarrazin opined that it is "substantially likely" that Diaz will be restored to competency if given anti-psychotic medication.

Dr. Sarrazin further testified that the American Psychiatric Association ("APA") has promulgated practice guidelines and data addressing the treatment of schizophrenic patients. The APA data reported that 83% of "first episode" patients experience "stable remission," by the end of one year of treatment, meaning their symptoms (such as hallucinations and confusion) decrease to the point that the individual can return to his or her normal activities. The end point of the APA data, Dr. Sarrazin stated, was that individuals get to this type of remission, rather than "competency." The APA data showed, however, that between 10% and 30% of schizophrenic patients have little to no response to anti-psychotic medication, and that up to another 30% have only a "partial" response to medication, "meaning they exhibit improvement in psychopathology but continue to have mild to severe residual hallucinations or delusions." The APA data did not address success rates in situations where competency, rather than remission, was the end point.

Id. at 1322.  Dr. Sarrazin's report also describes a more recent study finding that approximately 79 percent of defendants in the federal court system who were involuntarily medicated due to a psychotic illness over a six-year period ultimately became competent to stand trial.  (Doc. 115 at 37-38; Doc. 101-1, Sarrazin Report at 5-6). In light of these studies and his own experience, Dr. Sarrazin believes that antipsychotic medications are "the gold standard for treatment of individuals with schizophrenia."  (Doc. 115 at 38).

10

Dr. Sarrazin testified regarding Ruark's history with antipsychotic medications. When Ruark first arrived at Springfield, his medical records included a prescription for 80 milligrams of Geodon once per day.  (Id. at 38-39).  Dr. Sarrazin testified that this was about half of the normal therapeutic dose.  (Id. at 39).  Dr. Sarrazin would not consider Geodon to be a failure if someone taking that amount was not restored to competency.  (Id.).  Ruark initially wanted to discontinue the Geodon but he was later persuaded to resume it on a trial basis.  (Id. at 38-39).  His dosage was increased to 80 milligrams twice per day.  (Id. at 39-40).  After two months, however, he stopped taking the medication, saying that it had weakened his immune system and that he did not think that he needed it.  (Id. at 40).

Dr. Sarrazin testified that he noticed some improvement in Ruark's symptoms while he was on Geodon.  (Id.).  However, Ruark remained "hypervigilant" and paranoid in his dealings with others.  Had Ruark remained willing to take the medication, Dr. Sarrazin would have increased the dosage to 80 milligrams during the day and 120 milligrams in the evening.  Ruark appeared to be tolerating the Geodon "without difficulty," and Dr. Sarrazin did not observe any serious side effects.  (Id.). Since returning to USP Atlanta, Ruark has begun taking 0.5 milligrams of Risperdal per

AO 72A
(Rev.8/82)

day, but Dr. Sarrazin believed that this low dose is unlikely to have any long-term therapeutic effect.  (Id. at 42).

Dr. Sarrazin noted that antipsychotic medications are the "treatment of choice" for psychotic disorders such as schizophrenia.  (Id. at 41).  These drugs are classified as "first generation" or "second generation."  Examples of first-generation drugs include Haloperidol (also known as Haldol) and Fluphenazine Prolixin.  (Id.). Second-generation antipsychotics include Geodon, Abilify, Risperdal, Ziprexa, and Olanzapine.  (Id. at 41-42).

In his testimony and his written report, Dr. Sarrazin described the side effects of these medications at some length.  (Id. at 41-51; Doc. 101-1, Sarrazin Report at 7-11). He stated that first-generation antipsychotics sometimes cause shakiness, stiffness, akathesia (internal restlessness), and tardive dyskinesia, which is characterized by abnormal body movements.  (Doc. 115 at 43-44).  Those symptoms are not seen as frequently with second-generation drugs.  (Id.).  On the other hand, second-generation drugs can cause elevated glucose levels, weight gain, and elevated lipids.  (Id. at 43). These metabolic symptoms are often seen with  Seroquel and Zyprexa but are less common with Abilify and Geodon.  (Id.).

12

Dr. Sarrazin noted that the staff at Springfield is trained to recognize and treat all of these side effects. (Id. at 44-45). Most symptoms can be treated by adjusting the dosage of the antipsychotic medication or by administering ancillary medications. (Id. at 45-46). Patients are monitored to ensure that they are not displaying elevated levels of glucose, lipids, and cholesterol. (Id. at 50-51). Those problems can be treated by changing medication dosages, altering diet, or encouraging patients to get more exercise. (Id.). If a patient suffers from serious side effects, the patient will be switched to a different antipsychotic medication. (Id. at 46).

Dr. Sarrazin described other side effects that are rarer but more serious. Neruoleptic malignant syndrome is a condition that triggers high body temperature, muscle breakdown, and kidney problems. (Id. at 47). It usually occurs when a patient is given an initial dose of a first-generation antipsychotic. (Id. at 48). Another dangerous side effect is cardiac arrythmea, which can result in sudden death. The medical staff monitors for this condition by checking an electrocardiogram. (Id.). The medical staff has the ability to quickly move the patient to a nearby hospital if an intensive care setting is needed. (Id. at 45). Anti-psychotics also can trigger drug-induced parkinsonism, which is characterized by tremors similar to those seen in

13

Parkinson's disease.  (Id. at 50).  That condition can be effectively treated through the use of ancillary medications.  (Id.).

Dr. Sarrazin testified that Ruark is not likely to regain competency in the absence of medication.  (Doc. 115 at 51; Doc. 125 at 5).  He stated that a patient on antipsychotics generally will begin to show signs of improvement within six to eight weeks, with full restoration to competency in four to eight months.  (Doc. 115 at 56). Although there is no cure for schizophrenia, antipsychotic medications will reduce Ruark's level of paranoia and make him less focused on his delusions, allowing him to work with his attorney on his defense strategy.  (Doc. 115 at 59).

Dr. Sarrazin believed that treatment with antipsychotics would be appropriate for Ruark on medical grounds.  (Doc. 115 at 59-60; Doc. 125 at 5).  He stated that antipsychotics are unlikely to cause side effects that will prevent Ruark from communicating with his attorney or receiving a fair trial.  (Doc. 115 at 59-60).  Should he develop any such side effects, the medical staff will simply conclude that he is not fit to stand trial.  (Id. at 60).

Dr. Sarrazin observed that the general plan is to prescribe the lowest effective dose of antipsychotic.  (Doc. 125 at 43).  This helps to avoid the danger of negative side effects.  (Id.).  If a particular drug does not appear to be having a therapeutic effect, then

14

the defendant can be switched to another antipsychotic.  (<u>Id.</u> at 44).  The fact that a patient does not respond to one drug does not mean that others will be ineffective.  (<u>Id.</u>).

### C.    Treatment Proposal

Dr. Sarrazin's written report details the treatment plan that will be implemented should the Court order that Ruark be involuntarily medicated.  (Doc. 101-1, Sarrazin Report at 14-16).  The staff at Springfield will first present Ruark with a copy of the order and will try to convince him to take an oral antipsychotic medication at the lowest effective dose.  (<u>Id.</u> at 14).  If Ruark is willing to cooperate, he will be given Abilify, Geodon, Risperdol, or Haldol.  (<u>Id.</u>).  If he suffers from any side effects that are not relieved by adjunctive medications, he will be switched to another antipsychotic.  (<u>Id.</u> at 15).

If Ruark is unwilling to cooperate and must be forcibly medicated, Dr. Sarrazin will begin by administering a test dose of 5 milligrams of Haldol.  (<u>Id.</u> at 15).  The medical staff will then monitor Ruark to see if he has any harmful reactions to that medication.  If Ruark is able to tolerate the haloperidol, he will receive a greater dose the next day.  Ruark would continue to receive intramuscular doses of Haldol every two

AO 72A
(Rev.8/82)

to four weeks during his treatment, in doses ranging from 75 milligrams to 200 milligrams.  (Id.).

If Ruark develops neuromuscular side effects during his treatment, he will be given other medications to treat those adverse effects.  (Id. at 15-16).  If Ruark continues to suffer side effects despite these adjunctive treatments, his Haldol would be discontinued and he would be treated with another long-acting antipsychotic medication.  (Id. at 16).  If Ruark becomes agitated or combative during the involuntary medication process, he will be given an injection of Lorazepam, a sedative.  (Id.).

While Ruark is being involuntarily medicated, he will be "monitored for possible development of diabetes or possible emergence of elevated serum lipids."  (Id.).  The medical staff will check his weight and glucose level every month and monitor his serum lipids every three months.  If Ruark refuses to cooperate in these measures, "the protocol would be enforced involuntarily at approximately 90 day intervals.  After which, his weight could be measured and laboratory tests could be safely conducted." (Id.).

### D.     Ruark's statements

Ruark made a couple of statements on the record during the Sell hearing.  At the conclusion of the first part of the hearing, on May 20, he expressed adamant opposition

16

to any involuntary medication and suggested that the Geodon that he previously had

taken had caused serious side effects:

> That is like rape.  I never hurt nobody.  I was thinking differently than they
> wanted me to think.  I was taking the medicine when I had problems, I still
> wasn't thinking the way they wanted me to think.  They wanted me to take
> more, couldn't walk down the hallway, lay in bed all hours of the day until
> I work again.  I will not feel better, I will not talk to doctors any more if
> they do that.  I barely not talk to them.  I trusted Dr. Preston.  She sat there
> today and lied.

(Doc. 115 at 61).  During the second part of the hearing, Ruark again exclaimed that he

is not likely to cooperate with the doctors in the future due to their efforts to have him

involuntarily medicated:

> I'm not going to talk to y'all no more 'cause you've either got to be a —
> a doctor, a psychiatrist, or a government agent.  You can't be both.  I'm
> not talking to none of 'em, no more doctors.
> . . .
> [A]ll I see up here is lies, lies, lies, you know what I'm saying.  And then,
> like, it's — I don't know who to trust anymore because you've got
> government agents, psychiatrists working on the same team, and I — it
> frustrates me.

(Doc. 125 at 29).

### E.   Dr. Ramirez's testimony

Dr. Gabriella Ramirez-Laon works as a psychologist at USP Atlanta.  (Doc. 126

at 96-97).  One of her duties is to perform screening in the Transit Unit, where Ruark

currently is housed.  (Id. at 97).  On various occasions, Dr. Ramirez has heard Ruark

17

express paranoid beliefs about the government.  (Id. at 101).  A few weeks before the hearing, Ruark had come to see her because he was afraid of being involuntarily medicated.  (Id. at 98-99).  His speech was "pressured" and he appeared to be "stressed out."  (Id. at 99-100).  Dr. Ramirez attempted to calm him by pointing out that no one at the Atlanta penitentiary had ever tried to forcibly medicate him.  (Id. at 100).

Dr. Ramirez testified that Ruark had taken medication only sporadically since his return to USP Atlanta.  (Id. at 101).  At one point, he was prescribed a low dose of 0.5 milligrams of Risperdal.  (Id. at 102, 107).  The penitentiary administers medication under nurse supervision to ensure that inmates are actually taking all of the prescribed medication.  (Id. at 106).

**F.    Evidence concerning medication dosage**

During the Sell hearing, the defense introduced excerpts from the Physician's Desk Reference ("PDR") regarding treatment guidelines for various antipsychotic drugs.  These guidelines show that Geodon has been approved by the Food and Drug Administration ("FDA") for target ranges between 20 milligrams and 100 milligrams twice per day.  (Def. Exh. 11).  Dosages of greater than 80 milligrams twice per day are "not generally recommended."  Dosages at the prescribed levels can be expected to show results within four to six weeks.  (Id.).

The PDR also states that Abilify has been approved under FDA trials with recommended initial dosages of 10 to 15 milligrams per day. (Def. Exh. 12). The FDA has recommended a maximum dose of 30 milligrams per day. At these levels, Abilify has been found to be effective after four to six week trials. (Id.). Ruark also introduced evidence that Risperdal has been approved in amounts ranging from 2 milligrams to 3 milligrams per day. (Def. Exh. 13). The FDA has found those dosages to be effective in four to six week trials. (Id.). The PDR indicates that doses of Risperdal above 16 milligrams have not been evaluated. (Def. Exh. 14).

The maximum dosages that Dr. Sarrazin has requested permission to administer are greater than those approved by the FDA. (See Doc. 101-1 at 14). Dr. Sarrazin clarified, however, that there are instances when psychiatrists may prescribe medications off-label.[2] (Doc. 125 at 21-22). Sometimes literature will be published after FDA approval showing that a greater dosage than what is prescribed in the PDR is medically appropriate. (Id. at 21, 42). Doctors do keep the PDR maximums in mind,

---

[2] A physician makes an "off label" use of a drug by prescribing it for symptoms for which it has not been tested by the FDA or using it at a dosage level that has not received FDA approval. Christopher M. Wittich, Christopher M. Burkle, and William L. Lanier, "Ten Common Questions (and Their Answers) About Off-label Drug Use," Mayo Clinic Proceedings 87(10), 982-990 (October 2012), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538391/ (last visited February 21, 2014).

AO 72A
(Rev.8/82)

but they are legally allowed to prescribe a greater amount.  (<u>Id.</u> at 42-43).  Dr. Sarrazin

emphasized that the goal is to use the lowest effective dose that does not cause serious

side effects.  (<u>Id.</u> at 43).

**G.    Ruark's family history**

During the hearing, defense counsel also proffered evidence that Ruark has a

history of diabetes in his family:

> I've been on the phone with Mr. Ruark's grandmother.  Her name is
> Virginia Flourry . . . and she has relayed to me – she's 75 and lives in
> Milledgeville. And she's related to me that there's a history of diabetes in
> the family, that Mr. Ruark's biological father died of complications from
> diabetes, had both legs surgically removed, and that it travels up both sides
> — the maternal and paternal grandparents also have diabetes, and she in
> fact herself has diabetes and is not supposed to drive.

(Doc. 125 at 55).  This is relevant because elevated glucose levels are one side effect

of antipsychotic medications.  (<u>See</u> Doc. 115 at 43, 50-51).  When questioned about

Ruark's family history, Dr. Sarrazin noted that some second-generation antipsychotics,

such as Abilify and Geodon, do not appear to have any effect on the patient's glucose

level.  (Doc. 125 at 25).  Should Ruark be involuntarily medicated, his glucose levels

will be monitored once per month.  (<u>Id.</u> at 26).

20

## III.   Discussion

The Supreme Court has held that "an individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs—an interest that only an essential or overriding state interest might overcome." Sell, 539 U.S. at 178-79, 123 S.Ct. at 2183 (internal quotation marks omitted).   When the government seeks to have a defendant involuntarily medicated in order to restore him to competency, a court must consider four factors: (1) whether the government has an important interest in proceeding to trial; (2) whether involuntary medication would "significantly further" that interest; (3) whether involuntary medication is necessary to further the government's interest; and (4) whether involuntary medication is "medically appropriate," meaning that it is "in the patient's best medical interest in light of his medical condition." Id. at 180-81; 123 S.Ct. at 2184-85 (emphasis omitted).[3]   The government bears the burden of proving each of these factors by clear and convincing evidence.   Diaz, 630 F.3d at 1331-32.

---

[3]Before applying the Sell factors, a court first should consider whether involuntary medication is appropriate on the ground that the defendant poses a danger to himself or others.   Involuntary medication is permitted in those situations under Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).   Here, the BOP has determined that Ruark does not pose a danger so long as he remains in a penal setting.   (See Doc. 101-1, Sarrazin Report at 3-4; Doc. 115 at 24-26).   Thus, involuntary medication under Harper would not be appropriate.

21

**A.      The government has a strong interest in prosecuting Ruark.**

The first <u>Sell</u> factor measures the strength of government's interest in bringing the defendant to trial.  <u>Sell</u>, 539 U.S. at 180, 123 S.Ct. at 2184.  The government's interest in prosecution is particularly strong where the defendant is charged with a serious crime against persons or property.  <u>Id.</u>  A court should also consider any special circumstances that lessen the need for prosecution.  <u>Id.</u>  For example, if the defendant is likely to be civilly committed for a lengthy period as a result of his refusal to take medication, then there is less of a danger that he will commit other crimes if not prosecuted.  <u>Id.</u>  The government's interest also is lessened if the defendant already has spent substantial time in custody, for which he will receive credit against any future sentence.  <u>Id.</u>

Here, Ruark is charged with several serious offenses, including an armed bank robbery and an armed robbery of another business.  (<u>See</u> Doc. 1).  The indictment alleges that Ruark carried and brandished a firearm during both robberies.  (<u>Id.</u> at 1-3).  These were serious offenses not just against the property of the businesses involved but also against the safety of the individuals who were at these locations at the time of the robbery.  The government's interest in prosecuting and punishing these offenses is substantial.

22

Ruark observes that the government sometimes chooses not to proceed with involuntary medication for federal prisoners at Springfield, even though most federal crimes can be characterized as serious.  (See Doc. 129 at 13) (quoting Doc. 126 at 66) (testimony of Dr. Preston-Baecht).  But even among federal crimes, this case appears to stand out.  Ruark is accused of committing two robberies and brandishing a firearm during both offenses.  (See Doc. 1).  He also has a record of prior felony convictions. (See id. at 3-4).  The fact that the government has not sought involuntary medication in every case does not diminish the strength of the government's interest in prosecuting Ruark.

Ruark also contends that the government has a lessened interest in prosecution because he already has spent four years in federal custody.  (See Doc. 129 at 14-15). However, given the offenses charged in the indictment, it is likely that Ruark's total term of imprisonment will exceed four years should he ultimately be convicted. The two armed robberies are likely to result in significant sentences, and Ruark would receive a mandatory consecutive seven-year term of imprisonment should he be convicted of brandishing a firearm as charged in Count Two or Count Four.   18 U.S.C. § 924(c)(1)(A)(ii).  This is not a case where the defendant has spent so much time in custody that he essentially will be sentenced to time served.

Ruark additionally observes that he may be involuntarily committed for a substantial period if he is not prosecuted.  (See Doc. 129 at 14-15).  At this stage, however, the likelihood of involuntary commitment is unclear.  A defendant may be committed under 18 U.S.C. § 4246 only if a court finds "by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another."

The BOP has already concluded that Ruark does not pose a danger to himself or others while confined in a penal setting.  (See Doc. 101-1, Sarrazin Report at 3-4; Doc. 115 at 24-26).  It is not entirely clear that the outcome would change if a court were evaluating whether Ruark should be released.  On the one hand, the charged offenses suggest that Ruark might pose a threat to the public if released, but on the other hand, it is not entirely clear that those crimes are a product of his schizophrenia.  Because the possibility of involuntary commitment is merely speculative, it does not overcome the government's strong interest in prosecution.  See United States v. Gutierrez, 704 F.3d 442, 450 (5th Cir. 2013) ("This court and other circuits have held that the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain.") (collecting cases); but see United States v. Grigsby, 712 F.3d 964, 970-71

24

(6th Cir. 2013) (reversing involuntary medication order where the government's experts testified that civil commitment was a realistic possibility and that the defendant might well be able to raise a meritorious insanity defense should the case go to trial). I conclude that the government has met its burden of showing, by clear and convincing evidence, that it has a strong interest in prosecuting Ruark.

**B.     Involuntary medication will significantly further the government's interest.**

The second Sell factor examines whether involuntary medication will "significantly further" the government's interest. Sell, 539 U.S. at 181, 123 S.Ct. at 2184-85. The Court must "consider and determine two underlying factual questions: (1) whether medication is 'substantially likely to render the defendant competent to stand trial,' and (2) whether the medication is 'substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.'" Diaz, 630 F.3d at 1332 (quoting Sell, 539 U.S. at 181, 123 S.Ct. at 2184-85). I conclude that the government has met its burden as to both of these questions.

1.   **Involuntary medication with antipsychotic drugs is likely to restore Ruark to competency.**

The evidence presented at the hearing demonstrates that antipsychotics are effective in a substantial majority of cases. The studies cited in Dr. Sarrazin's report found that involuntary medication was effective in 75 percent to 95 percent of cases. (See Doc. 101-1, Sarrazin Report at 5-7). Perhaps most pertinently, a recent study of federal prisoners shows that 79 percent of defendants who were involuntarily medicated ultimately became fit to stand trial. (Id. at 5-6; Doc. 115 at 37-38). These results are largely consistent with what the testifying doctors have seen in their own practice. Dr. Sarrazin and Dr. Preston-Baecht testified that between 75 to 80 percent of their involuntarily-medicated patients have been successfully restored to competency. (See Doc. 115 at 12, 36-37).

Ruark does not quarrel with these overall figures, but he suggests that they have little bearing on this case because his own history of treatment shows that anti-psychotic medications are unlikely to be successful. (See Doc. 129 at 15-16, 22-24). He observes that he took Geodon on two prior occasions with little apparent improvement. (See id.). However, Ruark was on the medication for no more than two and a half months at a

26

time, and the doctors testified that it generally takes four to eight months for a defendant's competency to be fully restored.[4]  (See Doc. 115 at 18, 21, 29, 56).

Dr. Sarrazin also testified that he would have increased the dosage of Geodon if Ruark had been willing to continue with the medication.  (Id. at 40).  It is quite possible that the higher dosage may have improved Ruark's symptoms.  In addition, Dr. Sarrazin stated that a patient who does not respond to one antipsychotic medication may respond to others.  (See Doc. 125 at 44).  Thus, the fact that Ruark did not completely recover while on Geodon for a brief period does not mean that further attempts at treatment will be unsuccessful.

Ruark also takes issue with the dosages in Dr. Sarrazin's proposed treatment plan. (See Doc. 129 at 16-17).  He correctly observes that the maximum dosages that Dr. Sarrazin has listed exceed the dosages specified in the PDR and in the FDA materials filed with the Court.  (Compare Doc. 101-1, Sarrazin Report at 14-16 with Def. Exh. 11-14).  As Dr. Sarrazin explained in his testimony, however, physicians may prescribe drugs off-label, and there may be support in the medical literature for dosages higher than those listed in the PDR.  (See Doc. 125 at 21-22, 42-43).  The government has

_____

[4]The medical literature suggests that Geodon will start to work in four to six weeks, (see Def. Exh. 11), but there is a distinction between when the medication will first be effective and when the defendant will be fully restored to competency.

shown that antipsychotic medications generally are an effective means of treating paranoid schizophrenia, and the evidence gives no reason to doubt that this treatment is likely to be successful in Ruark's case.

> **2.**   **Although antipsychotic medications can produce serious side effects, these will be closely monitored by the medical staff at Springfield, and are unlikely to affect Ruark's competency.**

Ruark also notes that antipsychotic medications can produce significant side effects that might affect his competency.  (See Doc. 129 at 17-20).  Dr. Sarrazin testified about these side effects at some length during the Sell hearing, but he also indicated that the worst of these effects can be avoided through monitoring and through the use of ancillary medications.  (See Doc. 115 at 41-51).  If Ruark develops a particularly serious side effect, he can be quickly transported to a local intensive care unit for treatment.  (See id. at 45).  Dr. Sarrazin's plan calls for starting at a low dosage to test Ruark's tolerance and then gradually increasing the amount over time until the drug becomes effective.  (See id. at 14-16).  Should Ruark develop any side effects that cannot be relieved through medication, he will be switched to another antipsychotic drug.  (See id.).

One side effect of antipsychotic medications is an elevated blood glucose level, and the evidence presented at the hearing shows that Ruark has a history of diabetes in

his family.  (See Doc. 115 at 43, 50-51; Doc. 125 at 55).  However, Dr. Sarrazin testified that elevated glucose levels are a problem only for certain second-generation drugs, such as Seroquel and Zyprexa.  (See Doc. 125 at 25).  Other drugs, such as Geodon or Abilify, typically do not cause the same metabolic side effects.  (See id.). Ruark has taken Geodon in the past without any adverse reaction being noted by the medical staff.[5]  (See Doc. 115 at 40).  In addition, the staff at Springfield will perform monthly monitoring of Ruark's glucose level, which should allow them to avoid any diabetes-related complications.

Ruark argues that involuntary medication will harm him by destroying his therapeutic relationships with the doctors and by reinforcing his paranoid beliefs about the government, the court, and defense counsel.  (See Doc. 129 at 20-22).  However, Ruark's paranoia is a direct result of his schizophrenia.  The purpose of treating Ruark with antipsychotics is to allow him to bring those beliefs under control to a degree that he can assist with his own defense.  Since Ruark's delusional beliefs have a biological cause, they are unlikely to disappear in the absence of medication.  (See Doc. 115 at 27, 51).  Moreover, Dr. Sarrazin testified that, if the medications do not effectively treat Ruark's delusions, the staff at Springfield will not certify that he is competent to stand

---

[5]Ruark has stated that he suffered from various side effects while on this medication,

AO 72A
(Rev.8/82)

trial.  (See id. at 59-60).  Thus, involuntary medication is not likely to harm Ruark's ability to assist in his own defense.  The government has met its burden of proof with respect to the second Sell factor.

### C. Involuntary medication is necessary to further the government's interest.

The third Sell factor examines whether involuntary medication is necessary to further the government's interest.  Sell, 539 U.S. at 181, 123 S.Ct. at 2185.  A district court may order involuntary medication only after making a finding that there are no "alternative, less intrusive treatments" available that would achieve the same result.  Id. The Court also must consider less intrusive methods such as presenting the defendant with "a court order backed by the power of contempt."  Diaz, 630 F.3d at 1335.

Here, the government has met its burden of showing that there are no alternative treatments that would restore Ruark to competency.  Dr. Sarrazin and Dr. Preston-Baecht testified that schizophrenia has a strong biological basis and that a Ruark is unlikely to recover in the absence of medication.  (See Doc. 115 at 23, 27, 51; Doc. 125 at 5).  Dr. Preston-Baecht believes that psychotherapy would be ineffective given Ruark's level of paranoia.  (Doc. 115 at 23).  Her own attempts to challenge his beliefs met with "great resistance."  (Id.).  Ruark did attend two competency restoration classes but found the experience to be "too upsetting" for him.  (Id. at 21-22).

30

Ruark argues that additional therapy might be effective if coupled with lower levels of medication. (Doc. 129 at 24). He points out that he has voluntarily been taking a small dose Risperdal since his return to Atlanta and that he appears to be doing much better. (Id.). Recent treatment notes do state that Ruark is doing fairly well and does not appear to be showing signs of a psychotic disorder. (See Doc. 126 at 83). However, Dr. Preston-Baecht explained that paranoid schizophrenics tend to be higher-functioning and may not show any signs of mental illness in situations where their delusional beliefs are not implicated. (See Doc. 126 at 87-88).

Dr. Sarrazin testified that the minimal half-milligram dose of Risperdal that Ruark is now taking is unlikely to reduce his delusional beliefs. (See Doc. 115 at 42). Ruark has so far resisted all of the doctors' efforts to convince him to take a larger dose that might restore him to competency. Therefore, there are no less intrusive treatment methods that might further the government's interest.

As noted above, the Court also must consider whether there are less intrusive means for administering the drugs aside from forced medication. See Diaz, 630 F.3d at 1335. Dr. Sarrazin's treatment plan effectively addresses this concern. Before attempting to forcibly inject Ruark with medication, Dr. Sarrazin will first provide Ruark with a copy of the court's order and give him an opportunity to take the

31

antipsychotics orally.  (See Doc. 101-1, Sarrazin Report at 14-15).  Should Ruark agree to take an oral antipsychotic, there will be no need to use more invasive procedures, but if he refuses to cooperate, there will be no reasonable alternative other than involuntary medication.  I conclude that the government has met its burden of proof under the third Sell factor.

> **D.     The use of antipsychotics is medically appropriate.**

The fourth Sell factor examines whether the involuntary administration of drugs is "medically appropriate" in the defendant's case.  Sell, 539 U.S. at 181; 123 S.Ct. at 2185.  A court should not order such treatment unless it is "in the patient's best medical interest in light of his medical condition."  Id.  One factor that the court should consider is the type of drug that the government is proposing to use, since "[d]ifferent kinds of antipsychotic drugs produce different side effects and enjoy different levels of success."  Id.  The government must present an individualized treatment plan that details the drugs to be used and the relevant dosage range.  United States v. Chavez, 734 F.3d 1247, 1253 (10th Cir. 2013); United States v. Hernandez-Vasquez, 513 F.3d 908, 916-17 (9th Cir. 2008); United States v. Evans, 404 F.3d 227, 241-42 (4th Cir. 2005).  The proposed treatment plan must be tailored to the defendant's particular medical condition.  Evans, 404 F.3d at 242.

Both Dr. Sarrazin and Dr. Preston-Baecht testified that the administration of anti-psychotic medications would be medically appropriate in Ruark's case.   (See Doc. 115 at 32, 59-60; Doc. 125 at 5).   Dr. Sarrazin noted that antipsychotics are considered to be the treatment of choice for patients with schizophrenia. (See Doc. 115 at 38).  The doctors agreed that Ruark's paranoia and delusions are unlikely to disappear in the absence of medication.  (See Doc. 115 at 27, 51; Doc. 125 at 5).

Dr. Sarrazin has drawn up a detailed treatment plan describing the procedure to be followed if the Court grants the government's motion for involuntary medication. (See Doc. 101-1 at 14-16).  Ruark objects that this plan is not medically appropriate because it calls for higher doses than have been approved in FDA trials, (see Doc. 129 at 26-29), but the plan does not call for starting out at these maximum dosages.  Instead, Dr. Sarrazin will begin with a low dose and slowly increase the amount over time should Ruark's symptoms not improve.  (See Doc. 125 at 43).  Moreover, Dr. Sarrazin testified that it is sometimes appropriate for psychiatrists to prescribe a dosage beyond that recommended by the FDA.  (See id. at 21-22, 42-43).

Dr. Sarrazin's treatment plan also takes into account the possibility of serious side effects.  One of the benefits of starting at a lower dosage is that the medical staff can monitor Ruark's reaction to the medication and can provide adjunctive drugs or

33

other necessary treatment.  The medical staff also will monitor Ruark's glucose level, and cholesterol.  (Doc. 115 at 50-51).  Thus, involuntary medication likely will not have a negative impact on Ruark's health.  The government has shown, by clear and convincing evidence, that the administration of antipsychotics is in Ruark's best interest in light of his medical condition.  See Sell, 539 U.S. at 181; 123 S.Ct. at 2185.  Thus, I conclude that all four Sell factors weigh in favor of involuntary medication.

### E.    Treatment Period

A defendant who is incompetent to stand trial may be remanded to the custody of the Attorney General for hospitalization for a reasonable period not to exceed 4 months to determine if he can be made competent through treatment.  18 U.S.C. § 4241(d).  Here, the government asks the Court to order that Ruark be returned to Springfield for the full four months provided by statute.  (See Doc. 101-1, Sarrazin Report at 17).  Ruark observes that he has already spent nine months at Springfield to no apparent effect, but the reason why his earlier treatment was not successful was because he was unwilling to take his prescribed medications during most of that period. I conclude that the government's request for an additional four months of treatment is reasonable.  Should it be necessary to continue the medication after that period, the government may present a properly-supported motion for additional time to the Court.

34

## IV.    Conclusion

I conclude that the government has met its burden of showing, by clear and convincing evidence, that each of the four <u>Sell</u> factors is met.  The government's interest in prosecution is substantial, involuntary medication is likely to restore Ruark to competency, there are no alternative methods of treatment available, and the administration of antipsychotic medications is medically appropriate in light of Ruark's medical condition.  Therefore, I **RECOMMEND** that the government's motion for involuntary medication (Doc. 102) be **GRANTED**.  The Court should direct that Ruark be remanded to the custody of the Attorney General for four months for treatment in accordance with the procedures outlined in Dr. Sarrazin's report.

IT IS SO RECOMMENDED this 25th day of February, 2014.

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)