
FILED IN CHAMBERS
U.S.D.C. - Atlanta

OCT - 2 2014

JAMES N. ...
By: _____
Deputy ...

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARK JOSHUA RUARK

CRIMINAL CASE NO.
1:10-CR-160-ODE-GGB

## ORDER

This criminal action comes before the Court on Mark Joshua Ruark's objections [Doc. 132] to the Non-Final Report and Recommendation ("R&R") of United States Magistrate Judge Gerrilyn G. Brill [Doc. 130], which recommends that the Government's Motion [Doc. 102] for involuntary medication be granted. For the following reasons, Ruark's objections [Doc. 132] are OVERRULED, the R&R [Doc. 130] is ADOPTED IN FULL, and the Government's Motion [Doc. 102] is GRANTED.

## I. Background

Defendant objects to several statements in the statement of facts, each of which is noted and reviewed <u>de novo</u>. The remainder of the R&R's statement of facts is uncontested and, not being clearly erroneous, is adopted by this Order and summarized below.

Defendant Mark Joshua Ruark is charged with bank robbery, Hobbs Act robbery, two counts of carrying a firearm during a crime of violence, and possession of a firearm by a convicted felon. Ruark suffers from schizophrenia and has been declared incompetent to stand trial. Ruark has refused to take his prescribed

antipsychotic medications,[1] so the Government has moved for an order directing that he be involuntarily medicated [Doc. 102].

A.  Initial Proceedings and Competency Determination

On April 13, 2010, a federal grand jury returned a five-count indictment against Ruark.[2]  Immediately following the indictment, Ruark was brought into federal custody on a writ, and Judge Brill ordered that he be detained.  Ruark has remained in custody since that time.  The trial in this case originally was set for January of 2011 but later was continued.  In February 2011, Ruark filed notice of his intent to raise an insanity defense.

In May 2011, the defense moved for an order declaring Ruark incompetent to stand trial.  This motion was based on the evaluation of a psychiatrist, Dr. Bhushan S. Agharkar, who concluded that Ruark was suffering from schizophrenia.  Following a competency hearing, both sides agreed that Ruark was not fit to

---

[1]Ruark objects to this statement on grounds that he has not refused to take all medications, only high doses of those medications [Doc. 132 at 5].  Reviewing the statement de novo, the Court overrules Ruark's objection.  The R&R does not state that he has refused to take all medications, and there is evidence that Ruark indeed has, at times, refused to take his medication as prescribed [see, e.g., Part II.B.1, infra].

[2]Count One alleges that Ruark carried out an armed robbery of a bank in Kennesaw, Georgia, in violation of 18 U.S.C. § 2113(a) and (d).  Count Two charges Ruark with carrying and brandishing a firearm during and in relation to the bank robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  Count Three states that Ruark robbed the CostPlus World Market in Kennesaw, a business engaged in interstate commerce, in violation of 18 U.S.C. § 1951.  Count Four alleges that Ruark brandished and carried a firearm during the CostPlus robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  Finally, Count Five charges Ruark with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

stand trial, and Judge Brill entered an order to that effect. Judge Brill directed that Ruark be remanded to the custody of the Attorney General for medical treatment. Ruark was transferred to the Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield"). On February 25, 2013, the Government moved for an order directing that Ruark be involuntarily medicated.

B.   The *Sell* Hearing

The Government's Motion prompted Judge Brill to hold a <u>Sell</u> hearing, which was conducted in two stages. During the first part of the hearing, which took place on May 20, 2013, the Government presented testimony from Dr. Lea Ann Preston-Baecht, a staff psychologist at Springfield, and Dr. Robert Sarrazin, the chief of psychiatry at Springfield.[3]  During the second part of the hearing, on November 5 and 6, 2013, defense counsel was given the opportunity to cross-examine both Dr. Preston-Baecht and Dr. Sarrazin in person. Defense counsel also presented testimony from Dr. Gabriella Ramirez-Laon, a clinical psychologist at the United States Penitentiary in Atlanta ("USP Atlanta").

1.   *Dr. Preston-Baecht's Testimony*

Dr. Preston-Baecht has worked as a staff psychologist at Springfield since 2000 and has extensive experience evaluating inmates and testifying as a forensic psychologist in federal court proceedings, including thirty or forty involuntary medication hearings. In her experience, somewhere between 75% and 80% of involuntarily medicated defendants are restored to competency.

---

[3]The testimony of these witnesses was taken via video conference.

Dr. Preston-Baecht evaluated Ruark when he first arrived at Springfield and concluded that his overall presentation "was consistent with someone who was paranoid of others."[4] She reviewed Ruark's mental health records from the Bureau of Prisons ("BOP"), which indicated that he had been taking Geodon, an antipsychotic medication, while housed at USP Atlanta. Later, Ruark was given a different antipsychotic medication, Zyprexa.[5]

Based on his records and the interview, Dr. Preston-Baecht diagnosed paranoid schizophrenia. She saw Ruark on a regular basis during his time at Springfield and convinced him to resume taking Geodon for a period of time. The medication appeared to calm him, but did not completely alleviate his paranoia.[6] Ruark stopped taking the drug after two months because he believed that it had weakened his immune system, causing him to catch a cold.

According to Dr. Preston-Baecht, Ruark had not taken the Geodon long enough or in a high enough dose for it to be fully effective. Upon her encouragement, Ruark resumed the Geodon in

[4]For instance, Ruark appeared "rather agitated" during the interview, indicated that someone was entering his room at night and trying to touch him sexually, and refused to talk about his personal history, insisting that he was not mentally ill.

[5]Dr. Preston-Baecht notes that, although these medications were prescribed, she could not tell from the medical records how regularly Ruark took them. Ruark objects to the R&R's inclusion of this statement to the extent it suggests that he in fact did not take the drugs as prescribed [Doc. 132 at 6]. The Court understands Dr. Preston-Baecht to indicate only that she had no basis from which she could testify to his compliance and therefore overrules Ruark's objection.

[6]According to Dr. Sarrazin, whose testimony is set out below, Ruark took 80 milligrams of Geodon twice per day during this period [Part I.B.2, infra].

4

August 2012, but soon stopped and refused to take it for the rest of his stay at Springfield.

Dr. Preston-Baecht thereafter requested an administrative hearing on whether Ruark could be involuntarily medicated on grounds of disability or dangerousness.[7] The hearing officer denied the request on grounds that Ruark, although suffering from a psychotic disorder, did not pose a danger to himself or others.

According to Dr. Preston-Baecht, alternative forms of treatment are not likely to restore Ruark to competency. Although Springfield does have a competency restoration group, the purpose of which is to explain how the criminal justice system works,[8] she testified that Ruark is "a bright young man who understands how the court system works." In her opinion, his "level of paranoia interferes with his ability to rationally apply that information to his own case." She believed that counseling or psychotherapy would also be ineffective because paranoid schizophrenia has a biological basis requiring medication. Without treatment, Dr. Preston-Baecht believed that Ruark would not be able to testify relevantly, communicate with his counsel, or make well-reasoned decisions regarding his case.[9]

---

[7]BOP regulations allow an administrative order of involuntary medication in cases where the inmate's condition poses a danger to himself or to others. Involuntary medication in these situations in constitutional under <u>Washington v. Harper</u>, 494 U.S. 210 (1990).

[8]Ruark attended only two sessions before he announced that he would no longer attend because it was too upsetting for him.

[9]Dr. Preston-Baecht specified that Ruark did not show a rational appreciation of the charges against him and "expressed great distress towards a number of individuals in the courtroom," including defense counsel.

5

Dr. Preston-Braecht testified that antipsychotic medication is the generally accepted standard for treating schizophrenia and is medically appropriate in Ruark's case. These drugs often take four to eight months to fully restore a patient to competency.

On cross-examination, Dr. Preston-Baecht recognized that USP Atlanta's treatment notes show that Ruark has done "fairly well" since returning from Springfield and does not show signs of a psychotic disorder. She believed, however, that Ruark was being guarded to avoid being labeled mentally ill and involuntarily medicated. In her experience, mentally ill patients commonly behave this way; individuals with paranoid schizophrenia are capable of higher functioning and can appear normal when their delusions are not implicated. She also recognized that civil commitment is sometimes an alternative to involuntary medication.

2. **Dr. Sarrazin**

Dr. Sarrazin has served as chief of psychiatry at Springfield since 2004, is trained as a medical doctor, has performed hundreds of psychiatric evaluations, and has frequently testified in involuntary medication hearings. Where medication was ordered, between 75% and 80% of his clients were restored to competency.

Dr. Sarrazin's written report discusses several studies regarding the effectiveness of involuntary medication in schizophrenic prisoners. The results are summarized as follows:

(1) a general 1992 study of 150 incompetent defendants in a state forensic hospital found that only 8 of these patients could not be restored to competency, yielding an approximate 95% success rate; (2) a 1993 study of 45 incompetent pre-trial defendants, suffering from psychotic disorders, found that 87% of these patients were restored to competency with involuntary psychotropic medication; (3) a 2007 study reviewing Ohio state psychiatric hospitalizations from 1995 to 1999

6

found that 75% of patients were restored to competency with involuntary medication; and (4) another 2007 study of 22 individuals diagnosed with delusional disorder (a psychotic disorder different from schizophrenia) found that 77% of the patients were restored to competency by the use of involuntary anti-psychotic medication.[10]

Dr. Sarrazin also discussed studies showing the effectiveness of antipsychotic drugs outside the criminal justice context. The American Psychiatric Association ("APA") reports that:

83% of "first episode" patients experience "stable remission," by the end of one year of treatment, meaning their symptoms (such as hallucinations and confusion) decrease to the point that the individual can return to his or her normal activities. The end point of the APA data . . . was that individuals get to this type of remission, rather than "competency." The APA data showed, however, that between 10% and 30% of schizophrenic patients have little to no response to anti-psychotic medication, and that up to another 30% have only a "partial" response to medication, "meaning they exhibit improvement in psychopathology but continue to have mild to severe residual hallucinations or delusions." The APA data did not address success rates in situations where competency, rather than remission, was the end point.

In a recent study, Dr. Sarrazin testified, approximately 79% of defendants in the federal court system who were involuntarily medicated due to a psychotic illness over a six-year period successfully regained competency. Dr. Sarrazin opined that antipsychotic medications are "the gold standard for treatment of individuals with schizophrenia."

Dr. Sarrazin noted that, when Ruark arrived at Springfield, his medical records included a prescription for 80 milligrams of Geodon once per day. According to Dr. Sarrazin, this was about half the normal therapeutic dose, and he would not consider Geodon

---

[10]The R&R takes this summary from United States v. Diaz, 630 F.3d 1314 (11th Cir. 2011), another case in which Dr. Sarrazin testified as an expert witness.

a failure if this dose did not restore a patient to competency. Ruark was persuaded to resume Geodon and was given 80 milligrams twice per day. After two months, however, Ruark stopped taking Geodon, believing that he didn't need it and that it weakened his immune system.

Dr. Sarrazin noticed some improvement in Ruark's symptoms while he was on Geodon, but testified that Ruark remained "hypervigilant" and paranoid. If Ruark had remained on the drug, Dr. Sarrazin planned to increase the dose to 80 milligrams during the day and 120 milligrams in the evening. Ruark appeared to tolerate Geodon "without difficulty," and Dr. Sarrazin did not observe serious side effects. After returning to USP Atlanta, Ruark began taking 0.5 milligrams of Risperdal per day--a dose Dr. Sarrazin believes is too low to have long-term therapeutic effect.

Dr. Sarrazin also discussed the side effects of antipsychotic medications. He testified that first-generation antipsychotics sometimes cause shakiness, stiffness, akathesia (internal restlessness), and tardive dyskinesia (characterized by abnormal body movements).[11] Those symptoms are not seen as frequently with second-generation drugs, but second-generation drugs can cause elevated glucose levels, weight gain, and elevated lipids. These symptoms are often seen with Seroquel and Zyprexa but are less common with Abilify and Geodon. The Springfield staff is trained to recognize and treat all of these side effects, most of which

---

[11]Antipsychotics are categorized as "first generation" or "second generation." Examples of first-generation drugs include Haloperidol (also known as Haldol) and Fluphenazine Prolixin. Second-generation drugs include Geodon, Abilify, Risperdal, Ziprexa, and Olanzapine.

8

can be treated by adjusting the dosage or administering ancillary medications. Patients are monitored to ensure that they are not displaying elevated levels of glucose, lipids, or cholesterol--problems that can be treated by changing dosages, altering diet, or encouraging exercise. Patients suffering from serious side effects will be switched to a different antipsychotic medication.

Other side effects, Dr. Sarrazin noted, are rarer but more serious. Neuroleptic malignant syndrome usually occurs when a patient receives an initial dose of a first-generation drug, and triggers high body temperature, muscle breakdown, and kidney problems. Cardiac arrythmea can result in sudden death. The medical staff checks an electrocardiogram to monitor for this condition; a patient can be quickly moved to a nearby hospital if in need of intensive care. Another side effect is parkinsonism, which is characterized by tremors similar to those in Parkinson's disease and can be effectively treated with ancillary medications.

According to Dr. Sarrazin, Ruark is unlikely to regain competency without medication. He noted that patients on antipsychotics will begin to show signs of improvement within six to eight weeks, with full restoration to competency in four to eight months. Antipsychotics will not cure schizophrenia, but will reduce Ruark's level of paranoia and make him less focused on his delusions, allowing him to work with his attorney on his defense.

Dr. Sarrazin opined that antipsychotics would be medically appropriate and are unlikely to cause side effects that will prevent Ruark from communicating with his attorney or receiving a fair trial. If he develops such side effects, the medical staff will conclude that he is not fit to stand trial.

9

Finally, Dr. Sarrazin observed that the general plan is to prescribe the lowest effective dose of antipsychotic, which helps to avoid negative side effects. If a drug does not appear to have a therapeutic effect, Ruark will be switched to a different drug.[12]

### 3.   *Treatment Proposal*

Dr. Sarrazin's written report details the proposed treatment plan should the Court order involuntary medication. First, the Springfield staff will present Ruark with a copy of the order and will try to convince him to take an oral antipsychotic at the lowest effective dose. If willing, Ruark will take Abilify, Geodon, Risperdol, or Haldol. If he suffers from side effects that are not relieved by ancillary medications, he will be switched to another antipsychotic.

If Ruark is unwilling to cooperate, Dr. Sarrazin will forcibly medicate Ruark, starting with a test dose of 5 milligrams of Haldol. Ruark will be monitored to see if he has any harmful reactions. If Ruark tolerates the Haldol, he will receive a greater dose the next day; he would continue to receive intramuscular doses every two to four weeks during his treatment, in doses ranging from 75 milligrams to 200 milligrams.

Ruark will receive other medications to treat any adverse neuromuscular side effects he may develop. Dr. Sarrazin will switch Ruark to another long-acting antipsychotic if the side effects continue despite ancillary medication. Dr. Sarrazin will

---

[12]Dr. Sarrazin explained that the fact that a patient does not respond to one drug does not mean that others will be ineffective.

administer Lorazepam (a sedative) should Ruark become agitated or combative during the involuntary medication process.

During his treatment, Ruark will be "monitored for possible development of diabetes or possible emergence of elevated serum lipids." His weight and glucose level will be checked every month, and his serum lipids every three months.[13]

### 4. *Ruark's Statements*

At the end of the first part of the Sell hearing, on May 20, Ruark expressed adamant opposition to any involuntary medication and stated that the Geodon had caused serious side effects:

> That is like rape. I never hurt nobody. I was thinking differently than they wanted me to think. I was taking the medicine when I had problems, I still wasn't thinking the way they wanted me to think. They wanted me to take more, couldn't walk down the hallway, lay in bed all hours of the day until I work again. I will not feel better, I will not talk to doctors any more if they do that. I barely not talk to them. I trusted Dr. Preston. She sat there today and lied.

During the second part of the hearing, Ruark exclaimed that he is not likely to cooperate with the doctors in the future due to their effort to have him involuntarily medicated:

> I'm not going to talk to y'all no more 'cause you've either got to be a--a doctor, a psychiatrist, or a government agent. You can't be both. I'm not talking to none of 'em, no more doctors. . . . I don't know how to trust anymore because you've got government agents, psychiatrists working on the same team, and I--it frustrates me.

---

[13]If Ruark refuses to cooperate, Dr. Sarrazin states that "the protocol would be enforced involuntarily at approximately 90 day intervals. After which, his weight could be measured and laboratory tests could be safely conducted."

### 5. *Ramirez's Testimony*

Ruark offered the testimony of Dr. Gabriella Ramirez-Laon ("Dr. Ramirez"), a psychologist at USP Atlanta who performs screening in the Transit Unit, where Ruark is currently housed. On various occasions, Ruark expressed paranoid beliefs to her about the government. A few weeks before the hearing, Ruark told her that he was afraid of being involuntarily medicated; his speech was "pressured" and he appeared "stressed out." Dr. Ramirez tried to calm him, noting that no one at USP Atlanta had ever tried to forcibly medicate him.

Dr. Ramirez testified that Ruark had taken medication only sporadically since his return to USP Atlanta. At one point, he was prescribed a low dose of 0.5 milligrams of Risperdal. The penitentiary administers medication under nurse supervision to ensure that inmates actually take the prescribed medication.

### 6. *Evidence Concerning Medication Dosage*

Ruark introduced excerpts from the Physician's Desk Reference ("PDR") regarding treatment guidelines for various antipsychotics. These guidelines show that the Food and Drug Administration ("FDA") has approved Geodon for target ranges between 20 and 100 milligrams twice per day. The PDR does not recommend dosages greater than 80 milligrams twice per day. The prescribed dosage levels can be expected to show results within four to six weeks.

Likewise, the FDA has approved Abilify for initial doses of 10 to 15 milligrams per day, with a maximum recommended dose of 30 milligrams per day. At these levels, Abilify has been found to be effective after four to six weeks. The FDA has approved Risperdal in doses of 2 to 3 milligrams per day and has found these doses

12

effective in four to six week trials. The PDR indicates that doses of Risperdal above 16 milligrams have not been evaluated.

Dr. Sarrazin seeks permission to administer doses greater than those approved by the FDA, but he explained that there are instances when medications may be prescribed off-label. Doctors keep PDR maximums in mind, but legally may prescribe a greater amount, and occasionally literature will be published after FDA approval showing that greater doses are medically appropriate. The goal is to prescribe the lowest effective dose that does not cause serious side effects.

### 7. *Ruark's Family History*

Ruark also offered evidence that he has a family history of diabetes. Ruark's grandmother related to defense counsel that:

> there's a history of diabetes in the family, that Mr. Ruark's biological father died of complications from diabetes, had both legs surgically removed, and that it travels up both sides--the maternal and paternal grandparents also have diabetes, and she in fact herself has diabetes and is not supposed to drive.

Although antipsychotic drugs can cause elevated glucose levels, Dr. Sarrazin noted that some second-generation antipsychotics, such as Abilify and Geodon, do not appear to affect glucose levels. If Ruark is involuntarily medicated, his glucose levels will be monitored once per month.

## II. Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a <u>de novo</u> review of those portions of the R&R to which Defendant has timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); <u>United</u>

States v. Raddatz, 447 U.S. 667, 673-74 (1980). However, for a party's objection to warrant de novo review, he "must clearly advise the district court and pinpoint the specific findings that [he] disagrees with." United States v. Schultz, 565 F.3d 1353, 1360 (11th Cir. 2009). The district court need not consider general objections. Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988). The remainder of the R&R, to which neither party offers specific objections, will be assessed for clear error only. See Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) (Story, J.).

III. Discussion

Ruark objects to the R&R on grounds that "the four factors listed in United States v. Sell, 539 U.S. 166 (2003), have not been established by clear and convincing evidence" [Doc. 132 at 1]. In support, he raises eleven arguments addressing the various factors. The Court, therefore, reviews de novo the application of the Sell factors to this case.

The Supreme Court has held that "an individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs--an interest that only an essential or overriding state interest might overcome." Sell, 539 U.S. at 178-79 (internal quotation marks and citation omitted). When the government seeks to have a defendant involuntarily medicated in order to restore him to competency, a court must consider four factors: (1) whether the government has an important interest in proceeding to trial; (2) whether involuntary medication would "significantly further" that interest; (3) whether involuntary medication is necessary to

14

further the government's interest; and (4) whether involuntary medication is "medically appropriate," meaning that it is "in the patient's best medical interest in light of his medical condition." Id. at 180-81 (emphasis omitted). The government must prove each of these factors by clear and convincing evidence. United States v. Diaz, 630 F.3d 1314, 1331-32 (11th Cir. 2011).

A.    Government's Interest

The government's interest in bringing a defendant to trial is important where the crime charged--whether against the person or against property--is serious. Sell, 539 U.S. at 180. Two special circumstances, however, may overcome the government's interest: (1) where the defendant's refusal to take medication will result in lengthy civil commitment, during which time the defendant will not pose a risk to others; and (2) where the defendant has spent substantial time in custody, for which he will receive credit against any future sentence. Id. Ruark first challenges the seriousness of the charged offense and, second, argues that special circumstances lessen the Government's interest here.

1.    *Seriousness of the Offenses*

Ruark argues that the Government has not shown that the offenses charged in his case are serious, contending that his case involves only two "run-of-the[-]mill robberies" [Doc. 132 at 11]. In fact, Ruark has been charged with several offenses, including the armed robberies of a bank and another business. Although Sell gives scant guidance for determining the seriousness of a crime, the statutory maximum penalty authorized for the charged offense is a helpful measure. See United States v. Evans, 404 F.3d 227, 237 (4th Cir. 2005) ("[I]t is appropriate to focus on the maximum

15

penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes."). Here, looking only at Counts Two and Four, Ruark faces mandatory seven-year consecutive sentences if convicted of brandishing a firearm. <u>See</u> 18 U.S.C. § 924(c)(1)(A)-(D); R&R at 23. Without drawing any bright lines, the Court concludes that the charges against Ruark are serious. <u>See</u> <u>Evans</u>, 404 F.3d at 238 (misdemeanor carrying maximum term of imprisonment of one year was not serious, but felony charge carrying a maximum term of 10 years was serious).

### 2. *Special Circumstances*

Ruark further argues that special circumstances lessen the Government's interest here. He contends first that, without medicine, he is likely to spend substantial time in civil mental health custody, [Doc. 132 at 13], and second that the Court should consider the possibility that, even if returned to competency, he might be found not guilty by reason of insanity.[14]

### a. **Possibility of Civil Commitment**

Under 18 U.S.C. § 4246(d), a defendant may be committed only if a court finds "by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result

---

[14]Ruark also argues that, because the Government does not always choose to pursue involuntary medication, "simply being charged with serious crimes does not automatically trigger a presumption of the existence of an important governmental interest" [Doc. 132 at 11]. The Court disagrees. <u>Sell</u> enumerates only two special circumstances that may weaken the government's interest. Although courts have considered other circumstances, <u>see</u> <u>United States v. Stephenson</u>, No. 1:10-CR-206, 2011 WL 3738967, at *8 (W.D. Mich. Aug. 23, 2011) (considering the defendant's mental responsibility), Ruark cites no authority finding that the government's discretion to prosecute weakens its interest in bringing a defendant to trial.

of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." Although the BOP has determined that Ruark does not pose a danger to himself or others so long as he remains in a penal setting, [Doc. 115 at 25-26], it is unclear whether this result would change if the Court were evaluating whether Ruark should be released. Ruark offers no evidence on this point, and a speculative possibility of civil commitment does not overcome the Government's interest. See United States v. Gutierrez, 704 F.3d 442, 450 (5th Cir. 2013) ("This court and other circuits have held that the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain.").

## ii. **Ruark's Mental Responsibility**

Ruark contends that the Court should weigh the four years he has spent in federal custody against the Government's interest in proceeding to trial, considering the possibility that he might be found not guilty by reason of insanity [Doc. 132 at 13]. Here Ruark conflates two special circumstances. Indeed, Sell provides that the Court must compare the time already served by the defendant to the length of any potential sentence. 539 U.S. at 180. Sell does not suggest that a potential not guilty verdict is relevant, and the R&R properly concluded that the potential sentence in this case may significantly exceed four years [see R&R at 23]. The cases cited by Ruark, on the other hand, carve out an additional consideration where the defendant might be found not guilty by reason of insanity. United States v. Stephenson, No. 1:10-CR-206, 2011 WL 3738967, at *8 (W.D. Mich. Aug. 23, 2011); cf. United States v. Walton, No. 08-20599-BC, 2009 WL 3562507, at

17

*2 (E.D. Mich. Oct. 28, 2009). In such cases, the likely lack of mental responsibility weakens the government's interest in prosecuting. Stephenson, 2011 WL 3738967, at *8.

Even if the Court were to recognize this additional special circumstance, Ruark has not shown that it applies in this case. In Stephenson, the defendant offered an examination addressing the issue of criminal responsibility. Id. On the basis of that exam, the court concluded that the defendant was likely to be found not mentally responsible. While there is strong evidence that Ruark suffers from mental illness, it is not clear that the offenses charged were a product of his schizophrenia. The Court will not speculate as to the success of Ruark's insanity defense, and thus does not agree that this consideration lessens the Government's interest in proceeding to trial.

B.   Will Medication Further the Government's Interest?

Under the second Sell factor, the Court must answer a two-part question: (1) whether medication is substantially likely to restore the defendant to competency; and (2) whether the medication is "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181.

1.   *First Prong*

The Government has produced clear and convincing evidence that antipsychotics are substantially likely to restore Ruark to competency. Both Dr. Sarrazin and Dr. Preston-Baecht testified that, in their experience and according to studies, 75-80% of patients who are involuntarily medicated are restored to

18

competency [Doc. 115 at 12, 37-38]. Ruark nevertheless argues that the APA study offered by Dr. Sarrazin shows that only 40% of patients reach a state of remission. This report, however, does not undermine the Government's showing with respect to antipsychotics in the competency context. Indeed, the APA study did not set out to restore defendants to competency, but to restore patients to complete remission. Whatever the difference between those standards, the Court simply notes that the APA study suggests there is one. The Government has clearly shown that antipsychotics are largely successful at restoring schizophrenic defendants to competency and need not show that the statistics hold true for achieving complete remission.

Ruark further argues that medication will not be successful in _his_ case. He notes that Geodon and Risperdal have failed to restore him to competency, and that he showed only some--not marked--improvement while taking Geodon. Indeed, although he states that he has complied with his current prescription of Risperdal, Dr. Sarrazin testified that a dose as low as 0.5 milligrams is not likely to restore a patient to competency [Doc. 115 at 42]. And although Ruark complied with a recommended dose of Geodon for two months, both experts testified that it would likely take four to eight months to restore competency [_Id._ at 29, 56]. Ruark therefore cannot show with any certainty that antipsychotics are unlikely to restore him to competency if taken at recommended doses for a sufficient period of time.

### 2. *Second Prong*

Dr. Sarrazin testified that the worst of the potential side effects caused by second-generation antipsychotics can be avoided

through monitoring and the use of ancillary medicines [Id. at 45-
50]. Ruark does not take issue with this testimony, but
challenges the likelihood that such monitoring will actually occur
at USP Springfield [Doc. 132 at 9]. For instance, while blood
glucose levels are a particular concern for a patient, like Ruark,
with a family history of diabetes, Ruark "seriously doubts that
his glucose levels will be monitored once per month" [Id.].
Without more, the Court will not entertain Ruark's doubts. The
Government has met its burden of showing that medication is
substantially unlikely to have side effects that will render the
trial unfair.

    C.   Necessity

Thirdly, a district court may order involuntary medication
only after a finding that there are no "alternative, less
intrusive treatments" available that would achieve the same
result. Sell, 35 U.S. at 181.

Here, the Government has shown that no less intrusive
alternatives exist to restore Ruark to competency [Doc. 15 at 27,
51]. Indeed, Dr. Preston-Baecht noted that paranoid schizophrenia
has a strong biological basis and that Ruark is unlikely to
recover in the absence of medication [Id. at 23]. She believed
that the competency restoration group, counseling, and
psychotherapy would be ineffective [Id. at 21-22].

To the extent Ruark challenges the high doses proposed by Dr.
Sarrazin, the Court addresses this objection under the fourth
factor--that is, whether the proposed treatment plan is medically
appropriate in this case. With respect to the third factor,

however, the Government has shown by clear and convincing evidence that medication is necessary to restore Ruark to competency.

D.    Is Medication Medically Appropriate?

Lastly, the Court must examine whether the involuntary administration of drugs is "medically appropriate" in the defendant's case. Sell, 539 U.S. at 181. The government must present an individualized treatment plan that details the drugs to be used and the relevant dosage ranges. United States v. Chavez, 734 F.3d 1247, 1253 (10th Cir. 2013); Evans, 404 F.3d at 241-42. The treatment plan must be tailored to the defendant's particular medical condition. Evans, 404 F.3d at 242.

Dr. Sarrazin and Dr. Preston-Baecht testified that the administration of antipsychotics would be medically appropriate in this case [Doc. 115 at 31-32, 59-60]. Dr. Sarrazin, further, has proposed a detailed treatment plan describing the procedure to be followed if the Court orders Ruark to be involuntarily medicated [Doc. 101-1 at 14]. This plan acknowledges the potential side effects and provides specific monitoring and emergency care should problems arise.

Ruark adamantly objects to the R&R's recommendation that the Court order involuntary medication without regard to whether the proposed doses exceed the PDR maximums. He argues that the Government has failed to show by clear and convincing evidence that dosages in excess of the PDR maximums are medically appropriate [Doc. 132 at 10]. Specifically, he notes that the Government "cited [no] studies or follow up literature to establish that higher dosages are medically appropriate" [Id.].

21

In this case, the Government has met its burden to show that the dosages described in the proposed treatment plan are appropriate. To be sure, Dr. Sarrazin's proposed dosage ranges for each of the suggested antipsychotics exceed the ranges stated in the PDR. He testified, however, that "there are times" when doctors prescribe medications at dosages above the PDR maximums [Doc. 125 at 21]. He explained that such dosages can be appropriate based on literature published after the FDA has approved the drug [Id.]. Further, he specified that the ranges stated in the proposed treatment plan do not represent target dosages and that they do not imply he would administer doses at the extreme high end of the range [Id.]. Rather, he stated that doctors are "aware of the PDR maximums and do keep [them] in mind," emphasizing that the goal is always to administer the "lowest effective dose" [Id. at 42; see also Doc. 101-1 at 15 ("The goal is to achieve clinical improvement at the lowest effective dose starting at the low end of the dosing range and gradually increasing the dose as clinically indicated.")].

The proposed treatment plan is medically appropriate in this case. Although Ruark correctly notes that Dr. Sarrazin did not offer specific literature addressing the use of the proposed antipsychotics at dosages above the PDR maximums, the Government's expert testimony convinces the Court that it is not medically inappropriate to include those dosages in the overall ranges set out in the proposed treatment plan. To the extent the Government may use dosages in excess of those recommended by the PDR, it has clearly and convincingly shown that those dosages will be used

22

where necessary and appropriate to restore Ruark to competency. Accordingly, the Government's motion is granted.

As a final matter, the Court notes that Ruark also objects to the R&R's recommendation that he be returned to Springfield for four months to be treated. Under 18 U.S.C. § 4241(d), a defendant who is found incompetent to stand trial may be remanded to the custody of the Attorney General for hospitalization for a reasonable period not to exceed four months to determine if he can be made competent through treatment, and for a reasonable additional period of time until he is restored to competency, if there is a substantial probability that he will be so restored. Here, the additional four months recommended by the R&R is reasonable, and Ruark's objection is overruled.

III. Conclusion

For the foregoing reasons, Ruark's objections [Doc. 132] are OVERRULED, the R&R [Doc. 130] is ADOPTED IN FULL, and the Government's Motion [Doc. 102] is GRANTED.

SO ORDERED this ___2___ day of October, 2014.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE